### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

MARK A. GATES,

      Debtor-Appellant,

v.

BANTERRA BANK,

      Creditor-Appellee.                          **Case No. 06-cv-41-DRH**

### MEMORANDUM & ORDER

**HERNDON, District Judge:**

### I. INTRODUCTION

It has been reported, that in speaking to the Clark County Nevada Bar Association in August of 2005, Justice John Paul Stevens remarked that the outcomes of two decisions he wrote for the majority of the Court were "unwise," however, "in each [he] was convinced that the law compelled a result that [he] would have opposed if [he] were a legislator." Greenhouse, Linda, *Supreme Court Memo; Justice Weighs Desire v. Duty (Duty Prevails)*, NY TIMES (Aug. 25, 2005), http://select.nytimes.com/gst/abstract.html?res=F50B15FA355A0C768EDDA108 94DD404482&n=Top%2fReference%2fTimes%20Topics%2fPeople%2fS%2fSteve ns%2c%20John%20Paul (last visited Sept. 29, 2006). Though far from working in the same realm as that of Justice Stevens, this humble judge finds himself in the position of having to make a decision he finds unwise in its result but commanded

by the law established by the legislature. Before the Court is debtor-appellant Mark Gates's appeal of the judgment of the United States Bankruptcy Court for the Southern District of Illinois, which found that pursuant to **11 U.S.C. § 523(a)(2)(A)**, Gates's liability to creditor-appellee Banterra Bank was non-dischargeable.  The Court has jurisdiction over the appeal pursuant to **28 U.S.C. § 158(a)**.  Because the Court finds that Banterra's reliance was not justifiable, it reverses the judgment of the bankruptcy court.

## II.  FACTUAL BACKGROUND

Gates initiated bankruptcy proceedings as a debtor under Chapter 7 of Title 11 and listed Banterra as a creditor.  Banterra thereafter filed an adversary complaint, seeking exception from discharge (*see* Doc. 1, *Banterra Bank v. Gates*, Adversary No. 05-4071, Bankruptcy Court, S.D. Ill., Meyers, J., April 11, 2005).  A hearing was conducted, from which the bankruptcy court issued the following findings of fact, which the Court now recounts.

Gates purchased a 1996 Freightliner truck from Steven C. Foster for the sum of $20,000.  (Doc. 57, Order, ¶ 6, Adversary No. 05-4071, Bankruptcy Court S.D. Ill., Meyers, J., Dec. 8, 2005),  Mr. Foster and his wife, Tammy L. Foster, held the certificate of title on said motor vehicle purchased by Gates (*Id*. at  ¶ 7).  Around the time of the purchase, Gates also obtained an insurance policy for property damage from Northland Insurance Company ("Northland") on the truck in the amount of $20,000, with a $1,000 deductible for collision damage (*Id*. at ¶ 8).  In

December 2003, Gates wrecked the truck, totally destroying the vehicle (*Id.* at ¶ 9).

At that time, Gates still owed $14,000 on the vehicle to Fosters (*Id.* at ¶ 10).

William Rhodes, an adjuster for Northland, met with Gates andSteve

Foster on December 11, 2003, regarding the claim Gates made on his policy with

Northland, for damage to the vehicle (*Id.* at ¶ 11).  Rhodes determined, after

inspection of the vehicle, that the entire insured value of the vehicle was payable, so

he issued a check to Foster, the lienholder, for $14,000, representing the remaining

balance on the purchase contract (*Id.*).  He then paid Gates $5,000, which

represented the remainder of the insured value of the vehicle ($20,000), less the

$1,000 deductible and the $14,000 paid to Foster (*Id.*).  Gates and Foster then

endorsed the title of the vehicle and gave it to Rhodes for Northland (*Id.*).

Upon returning to his office, Rhodes completed reports regarding the

settlement of Gates's claim, but failed to properly code a report, which made it

appear to the computer system that the Fosters had not been paid the balance due

($14,000) on the vehicle (*Id.* at ¶¶ 13-14).  The computer system then issued another

check in the amount of $14,000, reading:

> Payable to:  Steven and Tammy Foster
>                        for the account of Mark Gates

This check was then automatically mailed to the address of the policy holder, Gates

(*Id.* at ¶¶ 15-16).  Gates received this check from Northland for $14,000 in the mail,

which he then sought to cash at Banterra Bank on December 26, 2003 (*Id.* at ¶ 17).

Gates dealt specifically with a Banterra bank teller by the name of

Angela McCurdy (*Id.* at ¶ 17).  She was familiar with Gates from having transacted business with him previously in her capacity as a bank teller (*Id.* at ¶ 18).  While she told Gates that he could not cash the check, he could deposit it into his account (*Id.*).  Although there were no endorsements on the checks, McCurdy, in the presence of Gates, stamped the back of the check with a stamp, which stated:

CREDITED TO THE ACCOUNT OF
THE WITHIN NAMED PAYEE
In accordance with payee instructions
Absence of Endorsement Guaranteed
Banterra Bank

(*Id.* at ¶ 19).  The check for $14,000 was then deposited into Gates's personal account maintained with Banterra (*Id.* at ¶ 20).  McCurdy further informed Gates that he would not be able to withdraw funds on the check until ten days later (*Id.* at ¶ 23).  The balance prior to deposit of the $14,000 check issued by Northland in Gates's account was $261.07 (*Id.* at ¶ 24).  After the ten day period had expired, on January 5, 2004, Gates withdrew $8,000 from his account at Banterra (*Id.* at ¶ 25), using $4,500 of this to purchase three certificates of deposit (*Id.* at ¶ 26).  Gates also opened three joint savings accounts held by Gates and each of his three minor children (*Id.*).  Gates spent the remainder of the $8,000 withdrawal on a gambling boat excursion (*Id.* at ¶ 27).  The next day, on January 6, 2004, Gates withdrew another $3,000 from his Banterra account, gifting this money to some of his relatives ((*Id.* at ¶ 28).  On January 14, 2004, Gates purchased a big screen television from the remaining funds of the $14,000 check issued by Northland (*Id.* at ¶ 29).

Several weeks after the second check for $14,000 was issued by

Page 4 of  13

Northland and mailed to Gates (by mistake), Rhodes realized his error, allowing duplicate funds to be issued on the same claim, and thereby contacted Gates, demanding that he return the money ($14,000) that was re-issued in error (*Id*. at ¶ 30). However, Gates replied that he had already spent the money (*Id*.). A formal letter, dated February 24, 2004, was sent by Northland to Gates, demanding return of the $14,000 issued by mistake (*Id*. at ¶ 31). On February 28, 2004 and again on March 1, 2004, Gates liquidated the certificates of deposit he had purchased on January 5, 2004, incurring a penalty on the early withdrawal (*Id*. at ¶ 32). Consequently, a few days prior to this, Gates had asked a Banterra Bank employee whether it was possible for a creditor to reach money held in a joint account with his minor children (*Id*. at ¶ 33). Gates was told that his creditors could, in fact, reach these funds (*Id*.).

### III.  ANALYSIS

The bankruptcy court appropriately found that the applicable statute regarding Banterra's adversary complaint was **11 U.S.C. § 523(a)(2)(A)**, which provides that a debt for money or property is non-dischargeable if the debt was obtained by false pretenses, false representation or actual fraud. Thus, in order to show a debt is properly nondischargeable under **§ 523(a)(2)(A)**, the challenging party (Banterra) has the burden of establishing: (1) the debtor made a misrepresentation; (2) the debtor knew the misrepresentation was false; (3) the misrepresentation was made by debtor with the intent to defraud; (4) the challenging

party justifiably relied upon the debtor's misrepresentation; and (5) the challenging party was proximately damaged therefrom. ***See In re Banke III*, 275 B.R. 317, 326 (N.D. Iowa 2002)(citing *Field v. Mans*, 516 U.S. 59, 74-75 (1995), for its holding that "§ 523(a)(2)(A) requires justifiable, but not reasonable reliance")**.

On an appeal, the Court may not set aside the bankruptcy court's findings of fact unless clearly erroneous.  However, the conclusions of law are reviewed *de novo*.  **FED. R. BANKR. P. 8013**.  Gates asserts that the issues on appeal in this matter are whether Banterra justifiably relied upon a misrepresentation made by Gates in seeking to deposit the check and whether Gates, through his actions, proximately caused Banterra's liability to Northland.  The parties disagree about whether the standard of review for the bankruptcy court's finding of justifiable reliance should be *de novo* or under the clearly erroneous standard,  The Court will review "any raw fact findings pertinent to the issue of justifiable reliance" under the clearly erroneous standard.  ***In re Spadoni*, 316 F.3d 56, 58 (1st Cir. 2003)(internal citation omitted)**.  Yet, "[t]he definition of the standard of justifiability is a purely legal issue, reviewable *de novo* . . . ." ***Id.* (internal citation omitted)**.

The bankruptcy court judge was in a better position to determine Gates's credibility of testimony.  Gates testified that he did not understand that the $14,000 issued in error by Northland and mailed to his residence was not intended for him.  The bankruptcy court did not find Gates to be truthful, stating:

Page 6 of  13

> [I]t's very difficult to believe that when [Gates] received this
> second check, knowing that the Fosters had been paid, that
> this money was his.  That's just impossible for the court to
> believe [*sic.*] . . . .  It appears to me that he knew the check
> was not his, and when he presented that check to the bank,
> that constituted a representation to the bank, it was a
> misrepresentation that the money was in fact his, when he
> knew that it was not his . . . .  He had knowledge of the falsity,
> and his intent was to cash the check, which he knew didn't
> belong to him.  The real issue is whether there was justifiable
> reliance on the part of the bank . . . .

(Doc. 54 - Transcript of Ruling by Judge Meyers on Nov. 1, 2005, pp. 3-4, Adversary
No. 05-4071, Bankruptcy Court, S.D. Ill. 2005).

**JUSTIFIABLE RELIANCE**

The bankruptcy court found that Banterra justifiably relied upon Gates's

misrepresentation that the check was his and also that the presentation of said check

to Banterra constituted that misrepresentation (Doc. 57, Order, ¶ 43, Adversary No.

05-4071, Bankruptcy Court S.D. Ill., Meyers, J., Dec. 8, 2005).  In particular, the

bankruptcy court found that because Banterra's teller, Ms. McCurdy, had seen Gates

"on previous occasions when he had transacted business with her at the bank" and

the check itself "stated that it was 'for the account of Mark Gates . . . Ms. McCurdy

relied on [Gates's] presentation of the check as a representation that the money, in

fact, belonged to him" (*Id.*).

Gates objects to the bankruptcy court's finding that Banterra's reliance

was justified.  The Court agrees with Judge Meyers that Gates did not actually believe

he was entitled to that $14,000 and that his behavior was completely dishonest.

However, when operating within the confines of the law, as is the Court's duty, it

Page 7 of  13

cannot agree with the bankruptcy court's finding of justifiable reliance.  During the hearing, Banterra's teller, Angela McCurdy,[1] testified regarding presentment of the check by Gates and Banterra's subsequent deposit of the check.  When questioned about how Gates presented the check to her while she was working as a bank teller, Ms. McCurdy stated Gates asked her, "Can I cash this check?" (*see* Doc. 73 - Transcript of November 1, 2005 Hearing, 53:24 - 54:2, Adversary No. 04-4071, Meyers, J., Bankruptcy Court S. D. Ill. 2005).  She thereafter testified that she told Gates he could not cash the check, but could instead deposit it into his checking account and could withdraw the funds after seven to ten days (*Id*. at 54:2-6).  Ms. McCurdy could recall any other comments from Gates on the day in question, but did admit that she "made a mistake" by stamping the back of the insurance check (*Id*. at 55:14-16).

Although she thought the check was intended for deposit into Gates's account because the check read "for the account of Gates," Ms. McCurdy also clearly noticed the check stated it was payable to Steve and Tammy Foster (*Id*. at 55:25 - 56:4).  Further, she testified that she had received training as an employee of Banterra, which taught her that when she is presented, as a teller, with a multiparty check, both parties should be there when depositing the check or else it should be already endorsed by the absent party (*Id*. at 57:7 - 58:10).  Thereafter, Ms. McCurdy admitted that she made a mistake by not having the check endorsed by the Fosters

---

[1]  At the time of the hearing, Angela McCurdy went by her married name instead, which is Angela Wildermurth, but for consistency, the Court will continue to identify her as "Angela Curdy," or "Ms. McCurdy."

before depositing it into Gates's account (*Id*. at 58:11-17).   Ms. McCurdy also

acknowledged that it was Banterra's policy to ensure that all parties on a multiparty

check have endorsed the check before depositing it (*Id*. at 60:9-13).

Further revealing is the following line of questioning of Ms. McCurdy

during the bankruptcy adversary proceeding hearing:

Q: Okay.  That is to say the only thing you did wrong was to not first ask for the endorsement of Steve and Tammy Foster, right?

A: Right.

Q: And it's true even if you recognized that as a multiparty check and Mark said hey, you know what Angela, it's my check, let me cash it anyway, you wouldn't have gone ahead and cashed it, right?

A: Right.

Q: You would have gone ahead and got the endorsement, correct?

A: Right.

Q: He didn't hold a gun to your head and say here, stamp the back of this check?

A: No.

Q: Okay.   And when you stamped the back of the check, that's an endorsement for somebody who is standing in front of you, right?

A. Yes.

Q: But it wouldn't be an endorsement for the Fosters that weren't standing in front of you?

A: Right.

* * *

Q: And the reason perhaps that you didn't make further inquiry concerning

the check, is because you knew him, and didn't think about questioning him a second time?

A: No, it said pay to the account of Mark Gates, and I knew him, so I, you know, deposited it into his account.

(*Id*. at 61:5 - 62:1, 62:21 - 63:6).

As much as the Court would like to find that Ms. McCurdy's reliance upon Gates when he presented the check to her was justified – it was, at the very least, an error in sound banking practice.  In fact, it appears clear by her testimony that she relied more upon the wording of the check, "for the account of Mark Gates," written by Northland, than she did upon any action attributable to Gates himself, other than the fact that she knew him from his previous banking transactions at Banterra.  Most importantly, as an employee of Banterra, Ms. McCurdy is an agent representing Banterra in the actions she performs within the scope of her employment duties.  Regardless of what Gates said or chose not to say to Ms. McCurdy regarding the check, it is not proper banking practice to deposit a check which is clearly a multiparty check without the endorsement of every party, whether that be a signed endorsement or an in-person ratification.  Although the wording of the check was somewhat ambiguous as to whether the funds were intended to be directed to the bank account of Mark Gates, the Court finds no ambiguity with the fact that the payees were Steve and Tammy Foster *only*.  Gates was not even listed as a payee on the check.  So to deposit the check without endorsement from *any* of the payees is absolutely improper.  To find otherwise would be render the term "justifiable reliance" meaningless.  Furthermore, that Gates *asked if he could cash*

*the check* suggests that the teller should have been tipped off to look for something unusual rather than interpret it as a representation that the check was valid for presentment.

Even though justifiable reliance is analyzed using a subjective standard, courts have found that when the instrument at issue itself reveals a clear warning sign of its falsity, the creditor cannot justifiably rely upon any misrepresentation made by the debtor. **See, e.g., In re Banke III, 275 B.R. 317 (N.D. Iowa 2002)(quoting In re Guske, 243 B.R. 359, 363 (8th Cir. BAP 2000))**. Thus, while justifiable reliance upon a debtor's misrepresentation is allowable even if an investigation would have revealed the falsity, when a creditor relies upon a misrepresentation easily "discovered by the senses during a cursory glance," such reliance is not justified. **Sanford Institution for Savings v. Gallo, 156 F.3d 71, 74-75 (1st Cir. 1998)(citing RESTATEMENT (SECOND) OF TORTS §§ 540 & cmt., 541 & cmt. (1976))**.

Subjectively, even though the wording of the check was confusing and she knew Gates, this cannot excuse the error of ignoring the plain language written on the face of the check, which clearly stated that the only payees, and the only ones able to cash, endorse, transfer or deposit the check, were Steve and Tammy Foster. Banks are strictly governed by various federal and state laws and regulations, which require the utmost compliance and professional standards. Ms. McCurdy was, or should have been, trained to meet these standards. For example, under Illinois'

adopted version of Article 3 of the Uniform Commercial Code, **810 ILL. COMP. STAT. § 5/3-101,** it clearly requires that "[i]f any instrument is payable to 2 or more persons not alternatively, it is payable to all of them and may be negotiated, discharged, or enforced *only by all of them*." (Emphasis added).

Unfortunately, the law in determining the dischargeability of a debt, as currently interpreted under **11 U.S.C. § 523(a)(2)(A)**, does not allow for a creditor's error when made despite an evident warning sign on the face of the instrument. Therefore, adherence to binding precedent of the law compels the Court to find Banterra's reliance upon Gates's misrepresentation was not justified, given the fact that it was plainly obvious the designated payee of the check was not Gates; it was Steve and Tammy Foster.  Even if Gates begged, pleaded and made up stories of why the check did not have the Fosters' endorsements (which the record does not reveal), banking standards and the law dictate that this multiparty check must be endorsed by all named payees before it can be deposited.  Therefore, despite the Court's strong hesitancy to allow Gates to escape the liability he well deserves due to his fraudulent and despicable actions, it has no choice but to reverse the finding of the bankruptcy court that Banterra's reliance was justified.  Thus, pursuant to **11 U.S.C. § 523(a)(2)(A)**, Gates's liability to Banterra must be dischargeable in bankruptcy.

Lastly, Gates also stated that a second issue on appeal was whether his actions proximately caused Banterra's liability to Northland.  As the Court has already found Banterra's reliance not to be justifiable, and therefore the liability

dischargeable, there is no need to address this issue.

### IV.  CONCLUSION

The Court, upon *de novo* review , hereby **VACATES** the finding of the bankruptcy court that Banterra justifiably relied upon Gates's misrepresentation regarding the check at issue, but the remainder of the bankruptcy court's findings of fact and conclusions of law are left undisturbed, as they were not issues presented on appeal.  Accordingly, pursuant to **11 U.S.C. § 523(a)(2)(A)**, Gates's liability to Banterra, as stated in Adversary No. 05-4017, filed in the United States Bankruptcy Court for the Southern District of Illinois, regarding Chapter 7 Bankruptcy Proceeding No. 04-41715, is hereby dischargeable.   Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Signed this 29th day of September, 2006.

/s/         David   RHerndon
**United States District Court**
